UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

:

SEBASTIAN P. BADAMO, *Executor for the Estate of*
*Carlo G. Badamo, Deceased*,

:
:
:

Plaintiff,

:
:

20-cv-5847 (LJL)

-v-

:
:

OPINION AND ORDER

CHEVRON U.S.A. INC., F/K/A GULF OIL
CORPORATION, et al,

:
:
:

Defendants.

:
:

---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/09/2022

LEWIS J. LIMAN, United States District Judge:

Plaintiff Sebastian P. Badamo ("Plaintiff"), Executor for the Estate of Carlo G. Badamo

("Badamo"), brings a claim under the Jones Act, 46 U.S.C. § 30104, alleging that Badamo

suffered from asbestos-related cancer due to the negligence of defendants Chevron U.S.A. Inc.

F/K/A Gulf Oil Corporation ("Chevron"); Chiquita Brands International, Inc. as successor in

interest to United Fruit Company ("Chiquita"); Farrell Lines, Inc. F/K/A American South

African Lines, individually and as successor in interest to America Export Lines, Inc. ("Farrell

Lines"); and National Bulk Carriers, Inc. ("National Bulk Carriers").  Dkt. No. 50.  Farrell Lines,

Chiquita, and Chevron (collectively "Defendants") each move for summary judgment.  Dkt. Nos.

80, 92, 96.

For the following reasons, the motions for summary judgment are denied.

# BACKGROUND

The following facts are undisputed for purposes of these motions except where otherwise indicated.[1]

## I.    Facts Regarding the Statute of Limitations

In 2008, Badamo filed a lawsuit against multiple shipowner employers, shipbuilders, machinery manufacturers, and distributors, alleging that he suffered from various injuries and diseases due to asbestos exposure aboard vessels during his merchant marine career.  Dkt. No. 81 ("Def.'s 56.1") ¶ 9; Dkt. No. 88 ("Pl.'s CS") ¶ 9; Dkt. No. 83-3.[2]

On July 17, 2017, Badamo underwent a chest X-ray, which showed: "Ill-defined large masslike opacities seen projected over the left lower lobe, new from prior exams.  Findings may represent a large pleural plaque.  However, further assessment with dedicated CT scan of the chest with contrast is recommended for clarification of findings and exclusion of a mass."  Def.'s 56.1 ¶ 2; Pl.'s CS ¶ 2; *see also* Dkt. No. 83-1 at 2.

---

[1] Defendants Farrell Lines, Chiquita, and Chevron submitted Rule 56.1 statements with almost identical facts.  *See* Dkt. No. 81 ¶¶ 1–9; Dkt. No. 95 ¶¶ 1–9; Dkt. No. 98 ¶¶ 1–9.  Chevron's 56.1 statement also included additional facts related to its non-statute-of-limitations asbestos-exposure argument.  *See* Dkt. No. 98 ¶¶ 10–24.  Plaintiff's counter statements to the three 56.1 statements included almost identical responses and additional facts.  *See* Dkt. No. 88 ¶¶ 1–18; Dkt. No. 104 ¶¶ 1–18; Dkt. No. 101 ¶¶ 1–9, 25–33.  Farrell Lines and Chevron submitted reply 56.1 statements.  *See* Dkt. Nos. 90, 106.  For ease of reference, when referring to the common facts among the three 56.1 statements, this Opinion cites to Farrell Lines' 56.1 statement, Plaintiff's counter statement to Farrell Lines' 56.1 statement, Farrell Lines' reply statement, and the related docket entries.  *See* Dkt. Nos. 81, 88, 90.

[2] The 2008 complaint alleged that: "As a direct and proximate result of said exposure to asbestos, Plaintiff suffers cancerphobia, traumatic stressful fear of affliction and worsening of pneumoconiosis as well as exacerbation of existing diseases; and suffers anatomical disorder, structural changes, pulmonary diseases inclusive of asbestosis / mesothelioma / lung cancer / pneumoconiosis / chronic obstructive pulmonary disease / colon cancer / stomach cancer / rectal cancer / kidney cancer / pancreas cancer / pharynx cancer / brain cancer / other anatomical cancer, et cetera, either singularly or in combination thereof; and, moreover, Plaintiff suffers harm in the form of necessity to be monitored for other asbestotic diseases including lung cancer."  Dkt. No. 83-3 ¶ 11.

On July 21, 2017, Badamo underwent a CT scan of his chest, which showed a seven-centimeter mass in the left lower lobe of the lung that was "highly suspicious for primary lung neoplasm."  Def.'s 56.1 ¶ 3; Pl.'s CS ¶ 3; Dkt. No. 83-1 at 5.  The CT scan report stated that "[i]nterventional radiology consultation for image guided biopsy of the dominant mass for a definitive tissue diagnosis is recommended."  Dkt. No. 83-1 at 5–6.

On July 26, 2017, Badamo met with Madhu S. Gowda, M.D. ("Dr. Gowda") who Plaintiff identifies as Badamo's primary care physician.  Def.'s 56.1 ¶ 4; Pl.'s CS ¶ 4.  The assessment and plan section of the visit record noted a "[l]arge lung mass in the left lower lobe with multiple small lung nodules in the same lung highly suggestive of advanced lung cancer and a high risk patient with previous history of more than 40-pack-year smoking history and asbestos exposure with pleural [p]laque."  Def.'s 56.1 ¶ 4; Pl.'s CS ¶ 4; Dkt. No. 83-1 at 14.  The record also stated, "we will arrange for a CT-guided biopsy," "[w]e will get a PET scan," and "[w]e will get oncology consult," among other things.  Dkt. No. 83-1 at 14.  The record also noted that "[p]atient and his family [were] extensively counseled."  *Id.*  The end of the record stated that the "Plan and Recommendations [were] discussed with the patient in detail" and that "Patient's questions were discussed and answered."  *Id.* at 16.

On August 1, 2017, Badamo underwent a PET scan, and the impressions from the scan stated in part: "Intense activity in a large left lower lobe lung lesion . . . , suspicious for malignancy.  Nodular change inferior to this more posterior and inferior within the left lower lobe also showing uptake and I suspect local metastatic disease versus adjacent inflammatory change.  More equivocal are the nodular areas in the lingula, one shows mild uptake.  Differential would include inflammatory change."  Pl.'s CS ¶ 13; Dkt. No. 90 ("Def.'s 56.1 Reply") ¶ 13; Dkt. No. 89-1 at 29.

3

David M. Rosenberg, M.D. ("Dr. Rosenberg"), an expert for Defendants, agreed with Plaintiff's counsel that "there was no way that Carlo Badamo could have learned that he had lung cancer unless and until he went to a hospital and had a biopsy done."  Pl.'s CS ¶ 16; Def.'s 56.1 Reply ¶ 16; Dkt. No. 89-7 at 45:5–9.  Dr. Rosenberg also agreed with Plaintiff's counsel that as of "July 26th and July 27th, no doctor should be telling Mr. Badamo that in fact he has lung cancer without getting the pathology reports back."  Pl.'s CS ¶ 15; Def.'s 56.1 Reply ¶ 15; Dkt. No. 89-7 at 50:19–24.

On August 2, 2017, a biopsy of the mass on the lower lobe of the left lung was performed, and the diagnosis was stated to be "adenocarcinoma, with features compatible with lung primary."  Def.'s 56.1 ¶ 7; Pl.'s CS ¶ 7; Dkt. No. 83-1 at 17.

On August 9, 2017, Badamo saw Dr. Gowda again for follow-up.  Pl.'s CS ¶ 14; Def.'s 56.1 Reply ¶ 14; Dkt. No. 89-1 at 33.  Compared to the record from the July 26, 2017 visit, the record from this visit reflects that the diagnosis of "Malignant neoplasm of the left lung/adenoca" was added to the "Patient Active Problem List."  Pl.'s CS ¶ 14; Def.'s 56.1 Reply ¶ 14; Dkt. No. 89-1 at 33.

The instant lawsuit was filed on July 28, 2020.  Def.'s 56.1 ¶ 1; Pl.'s CS ¶ 1; *see also* Dkt. No. 1.

Badamo passed away on November 15, 2020.  Def.'s 56.1 ¶ 8; Pl.'s CS ¶ 8.

## II.   Badamo and the Chevron Vessels—the Gulf Maracaibo, Gulfhorn, Gulfmills, and Gulfswamp

Badamo served in the merchant marines for eleven years from 1944 to 1955.  Dkt. No. 98 ("Chevron 56.1") ¶ 11; Dkt. No. 101 ("Pl.'s CS Chevron") ¶ 11.  During his eleven years in the merchant marines, Badamo served on various vessels, including four of Chevron's ships—the Gulf Maracaibo, Gulfhorn, Gulfmills, and Gulfswamp.  Chevron 56.1 ¶ 12; Pl.'s CS Chevron ¶

12.  The parties dispute how many days Badamo served on these four ships—Defendant asserts that Badamo served for a total of eighty-seven days, Chevron 56.1 ¶ 12, and Plaintiff asserts that he served for a total of eighty-nine days, Pl.'s CS Chevron ¶ 12.

The Court describes the evidence the parties put forth regarding Defendant Chevron.

## A.      Badamo Declaration and Testimony

Badamo declared, under penalty of perjury, that "[a]sbestos-containing products were used throughout the vessels" (defined to be the vessels he sailed on, which were all listed on the previous page and which included the Gulf Maracaibo, Gulfhorn, Gulfmills, and Gulfswamp); that "[d]ust was released from asbestos-containing products aboard these vessels"; that "[a]ll of the workers aboard these vessels breathed in dust from asbestos-products on a daily basis (frequently and regularly)"; that "[t]his exposure occurred from working with and near (in close proximity) asbestos-containing products"; that "[o]n a daily basis (frequently and regularly), [Badamo] and [his] co-workers aboard these vessels breathed dust from asbestos-containing products in the following areas of these vessels"—"Crews Quarters," "Engine Room," "Passage Ways," and "Galley"; and that "[o]n a daily basis (frequently and regularly), [Badamo] and [his] co-workers aboard these vessels breathed dust as a result of working with or near (in close proximity) asbestos-containing products or equipment insulated with asbestos-containing products including": "Pipe Insulation," "Gaskets/Packing," "Block Insulation," "Insulating Cement," "Turbines," "Valves," "Boilers," and "Pumps."  Pl.'s CS Chevron ¶ 53; Dkt. No. 106 ("Chevron 56.1 Reply") ¶ 53.

Badamo provided no testimony at his videotaped trial deposition or at his discovery deposition specifically regarding the Gulf Maracaibo, Gulfhorn, Gulfmills, or Gulfswamp. Chevron 56.1 ¶¶ 14, 20; Pl.'s CS Chevron ¶¶ 14, 20.  But Badamo testified that "[he] was exposed to asbestos every time [he] went on a ship."  Pl.'s CS Chevron ¶¶ 14, 89; Chevron 56.1

Reply ¶ 59; *see also* Dkt. No. 102-7 at 29:2–3.  As an engine room worker, Badamo assisted

with the repair and maintenance of engine room equipment.  Pl.'s CS Chevron ¶ 55; Chevron

56.1 Reply ¶ 55.  During the time frame that Badamo worked in the engine rooms (in the 1940s

and 1950s), the steam lines that connected the engine room machinery were insulated with

asbestos.  Pl.'s CS Chevron ¶ 55; Chevron 56.1 Reply ¶ 55.  The working conditions in the

engine room resembled a "mild snowstorm" of asbestos insulation.  Pl.'s CS Chevron ¶ 55;

Chevron 56.1 Reply ¶ 55.  It was frequently the case that Badamo and other engine room

personnel were disturbing this asbestos insulation, and this usually occurred with pipe insulation.

Pl.'s CS Chevron ¶ 55; Chevron 56.1 Reply ¶ 55.  Badamo described how he would have to

"chip off" the old asbestos insulation and replace it with new insulation.  Pl.'s CS Chevron ¶ 55;

Chevron 56.1 Reply ¶ 55.  Badamo described working with the "rolls and rolls" of asbestos

gaskets that he formed by banging them with a ball peen hammer.  Pl.'s CS Chevron ¶ 55;

Chevron 56.1 Reply ¶ 55.  Badamo also cut holes in this asbestos material.  Pl.'s CS Chevron

¶ 55; Chevron 56.1 Reply ¶ 55.  Removing the old asbestos gaskets was a messy process, and

Badamo would chisel and scrape the old asbestos gaskets off and then use a wire brush to clean

out the area.  Pl.'s CS Chevron ¶ 55; Chevron 56.1 Reply ¶ 55.  Badamo testified that mixing

loose asbestos was like someone playing in flour when baking bread.  Pl.'s CS Chevron ¶ 56;

Chevron 56.1 Reply ¶ 56.  This process—known as working with "asbestos mud"—was

necessary when Badamo replaced asbestos insulation on flanges located on steam pipes and

created a lot of dust.  Pl.'s CS Chevron ¶ 56; Chevron 56.1 Reply ¶ 56.  This occurred every time

there was a steam pipe leak.  Pl.'s CS Chevron ¶ 56; Chevron 56.1 Reply ¶ 56.

Badamo testified that he was exposed to asbestos in each position he held.  Pl.'s CS

Chevron ¶ 57; Chevron 56.1 Reply ¶ 57.  Badamo served as a fireman/water-tender on one of

Chevron's vessels and served as an oiler on two voyages on Chevron's vessels.  Pl.'s CS Chevron ¶¶ 57–58; Chevron 56.1 Reply ¶¶ 57–58.  As a fireman/water-tender, Badamo spent all his time in the engine rooms, and when asked if he was exposed to asbestos as a fireman/water-tender, Badamo responded, "Yes."  Pl.'s CS Chevron ¶ 57; Chevron 56.1 Reply ¶ 57.  As an oiler, Badamo worked in the engine room, and when asked if he was regularly exposed to asbestos in the engine rooms, Badamo replied that anyone who worked in the engine room was exposed.  Pl.'s CS Chevron ¶ 58; Chevron 56.1 Reply ¶ 58.  Badamo testified that the asbestos exposure was particularly bad in the engine rooms because the ventilation constantly circulated the asbestos dust.  Pl.'s CS Chevron ¶ 58; Chevron 56.1 Reply ¶ 58.

Badamo admitted during a deposition that he had no training to identify whether or not something contained asbestos.  Chevron 56.1 ¶ 16; Pl.'s CS Chevron ¶ 16.  He also testified that, during the time he was in the merchant marines, no one ever warned him that working with asbestos or asbestos products could be dangerous to his health.  Pl.'s CS Chevron ¶ 60; Chevron 56.1 Reply ¶ 60.  Badamo also testified that he would have worn a dust mask if one was available but that one was not available and that nobody ever said that he needed to wear one. Pl.'s CS Chevron ¶ 61; Chevron 56.1 Reply ¶ 61.

### B.   NAVIC

The Navigation and Vessel Inspection Circular ("NAVIC") No. 5-80, published in 1980 by the United States Department of Transportation, United States Coast Guard, recommended procedures for control of asbestos hazard on board merchant vessels.  Pl.'s CS Chevron ¶ 35; Chevron 56.1 Reply ¶ 35.  It "recommended procedures for controlling potentially hazardous exposure to airborne asbestos fibers by crewmembers on board merchant vessels, OCS facilities and deepwater ports."  Pl.'s CS Chevron ¶ 35; Chevron 56.1 Reply ¶ 35.  It stated that, "[i]n the past four decades, asbestos has been used for a great number of purposes with two-thirds of all

asbestos being used in the construction and shipbuilding industries" and that "[e]xposure to airborne asbestos fibers significantly increases the risk of incurring four serious diseases" including lung cancer.  Pl.'s CS Chevron ¶¶ 36–37; Chevron 56.1 Reply ¶¶ 36–37.  According to the NAVIC, "[a]ll vessels have some asbestos insulation material on board," and "[d]epending on the individual vessel/facility and year built, the amount and type of asbestos can vary from very little to significant amounts, especially in the engine room spaces."  Pl.'s CS Chevron ¶ 34; Chevron 56.1 Reply ¶ 34.  The NAVIC discussed how "[t]he degree of deterioration of installed asbestos insulation, release of asbestos fibers due to motion of a vessel working in a seaway, exposure to crewmembers incidental to asbestos work on board by others and work performed involving asbestos by crewmembers engaged in maintenance and repair are of major concern."  Pl.'s CS Chevron ¶ 38; Chevron 56.1 Reply ¶ 38.  The NAVIC stated that "[a]sbestos containing material is believed to have been installed on all types of vessels."  Pl.'s CS Chevron ¶ 39; Chevron 56.1 Reply ¶ 39.

Seven years later, in 1987, the United States Department of Transportation, United States Coast Guard issued another NAVIC, No. 6-87, which stated that "[s]hip that were constructed between 1940 and 1975 used substantial amounts of asbestos for insulation and fire protection."  Pl.'s CS Chevron ¶¶ 40–41; Chevron 56.1 Reply ¶¶ 40–41.  All of Chevron's vessels at issue in this case—Gulf Maracaibo, Gulfhorn, Gulfmills, and Gulfswamp—were constructed during that time period.  Pl.'s CS Chevron ¶ 42; Chevron 56.1 Reply ¶ 42.  The NAVIC noted that "[a]sbestos materials are believed to have been installed on all types of vessels."  Pl.'s CS Chevron ¶ 43; Chevron 56.1 Reply ¶ 43.

### C.    Corbin Expert Testimony

Plaintiff's marine chemist expert Troy Corbin ("Corbin") produced a report that stated that Badamo would have worked in engine rooms on equipment, which would have been

insulated with asbestos.  Pl.'s CS Chevron ¶ 50; Chevron 56.1 Reply ¶ 50.  Corbin's report also stated that Badamo "received significant asbestos exposures while sailing as a merchant mariner which exposed him to asbestos from various common materials aboard ships."  Pl.'s CS Chevron ¶ 51; Chevron 56.1 Reply ¶ 51.  Corbin's report also noted that Badamo indicated that his employers generally did not provide him warnings and that Corbin believed the hazards of asbestos were known for over ninety years.  Pl.'s CS Chevron ¶ 52; Chevron 56.1 Reply ¶ 52.

Corbin testified that he had not reviewed any specifications for any of Badamo's vessels, had not reviewed any drawings, blueprints, or construction drawings for any of Badamo's vessels, and had not seen any air sampling or industrial hygiene studies of any of Badamo's vessels.  Chevron 56.1 ¶ 23; Pl.'s CS Chevron ¶ 23; Dkt. No. 99-11.  In addition, when asked if Corbin had any reason to believe that Badamo had expertise in identifying asbestos dust as opposed to other kinds of dust, Corbin responded, "Probably not."  Chevron 56.1 ¶ 24; Pl.'s CS Chevron ¶ 24; Dkt. No. 99-11.

### D. Cooke Expert Testimony

Plaintiff's marine safety expert, Marjorie Murtagh Cooke ("Cooke"), produced a report that stated that "asbestos was widely installed aboard merchant vessels beginning in 1940 and continued through the 1970s" and "could be installed in virtually any and all areas of a merchant vessel."  Pl.'s CS Chevron ¶ 45; Chevron 56.1 Reply ¶ 45; Dkt. No. 102-3 at 8.  The report also stated that "[a]sbestos fibers could become airborne as a result of normal ship operations such as vibrations due to marine propulsion and machinery operation, maintenance, repair, or inspections of equipment and mechanical damage from normal activities."  Pl.'s CS Chevron ¶ 45; Chevron 56.1 Reply ¶ 45.  The report stated that Badamo's responsibilities aboard Defendants' vessels "would involve extended exposure to asbestos through handling and, most likely, breathing airborne fibers."  Pl.'s CS Chevron ¶ 46; Chevron 56.1 Reply ¶ 46.

9

According to Cooke, the United States Navy and Maritime Commission published, in 1943, a manual that warned of the "dangers of exposure to asbestos"; that "respiratory protective equipment" was required for "any job in which asbestos dust is breathed" such as those involving "handling, sawing or cutting asbestos or asbestos mixtures." Pl.'s CS Chevron ¶ 47; Chevron 56.1 Reply ¶ 47. Cooke's report stated that the shipping industry "knew, or should have known" in 1943 that exposure to asbestos was harmful to humans and that protective measures needed to be in place to protect people. Pl.'s CS Chevron ¶ 48; Chevron 56.1 Reply ¶ 48. Cooke's report stated that Defendants knew or should have known that Badamo would be exposure to asbestos aboard their vessels and that his exposure to asbestos, a known hazard, was dangerous to his health. Pl.'s CS Chevron ¶ 49; Chevron 56.1 Reply ¶ 49.

### E.  Dr. Kradin Expert Testimony

Plaintiff's medical expert, Richard Kradin, M.D. ("Dr. Kradin"), concluded that Badamo's exposures to asbestos and cigarette smoke were substantial factors in causing his lung cancer. Pl.'s CS Chevron ¶ 63; Chevron 56.1 Reply ¶ 63.

### F.  Co-Worker Testimony

Plaintiff's counsel provided a list of specific individuals in this action who might have been on the ships Badamo sailed on while in the merchant marines, including individuals related to the Gulf Maracaibo, Gulfhorn, Gulfmills, and Gulfswamp; Badamo could not recall ever working with any of these individuals. Chevron 56.1 ¶¶ 18–19; Pl.'s CS Chevron ¶¶ 18–19. Only one of Badamo's co-workers, Lawrence King ("King"), was deposed in this case, and King never served on any of these four ships and provided no testimony as to them. Chevron 56.1 ¶¶ 21–22; Pl.'s CS Chevron ¶¶ 21–22.

## PROCEDURAL HISTORY

This action was initiated by a complaint filed by Badamo on July 28, 2020.  Dkt. No. 1.

A First Amended Complaint was filed the next day.  Dkt. No. 3.  On February 4, 2021, Sebastian

Badamo as Executor for the Estate of Carlo G. Badamo moved to substitute himself as the

plaintiff in this action and moved for leave to file a Second Amended Complaint.  Dkt. No. 44.

The Court granted both motions.  Dkt. No. 47.

Plaintiff filed a Second Amended Complaint on February 10, 2021.  Dkt. No. 50.  The

Second Amended Complaint brings a survival claim under the Jones Act, 46 U.S.C. § 30104,

alleging that Badamo suffered from an asbestos-related cancer—lung cancer—due to the

negligence of Defendants.  Dkt. No. 50 at 10 ¶ 23, 11 ¶ 31.[3]  It alleges that Badamo was

employed by Defendants from 1944 to 1954 as a merchant mariner and that he developed this

cancer as a result of exposure to asbestos products while employed aboard Defendants' vessels.

*Id.* at 4 ¶¶ 12–14.

National Bulk Carriers answered on February 12, 2021, Dkt. No. 51; Farrell Lines

answered on February 23, 2021, Dkt. No. 53; Chiquita answered on February 24, 2021, Dkt. No.

54; and Chevron answered on March 2, 2021, Dkt. No. 55.  Chevron also crossclaimed against

all other Defendants, seeking indemnification and contribution.  *Id.*  The other Defendants denied

that they were liable by way of indemnity or contribution.  *See* Dkt. Nos. 51, 54, 56.

Plaintiff dismissed all claims against National Bulk Carriers without prejudice on

September 9, 2021, Dkt. No. 74, and Chevron dismissed all crossclaims against National Bulk

Carriers without prejudice on September 14, 2021, Dkt. No. 76.

---

[3] As the Second Amended Complaint repeats paragraph numbers, the Court cites to both page
and paragraph number.

Farrell Lines moved for summary judgment on September 27, 2021.  Dkt. No. 80.  Along with its motion, Farrell Lines filed a Rule 56.1 statement, a memorandum of law in support of its motion, and a declaration in support of its motion.  Dkt. Nos. 81–83.  On October 18, 2021, Plaintiff filed a memorandum of law in opposition to summary judgment, a counterstatement to Farrell Lines' Rule 56.1 statement, and a declaration in opposition to the motion.  Dkt. Nos. 87–89.  On October 25, 2021, Farrell Lines filed a response to Plaintiff's counterstatement and a reply memorandum of law in support of its motion.  Dkt. Nos. 90–91.

Chiquita moved for summary judgment on November 5, 2021, Dkt. No. 92, and filed a memorandum of law in support of its motion, a declaration in support, and a Rule 56.1 statement, Dkt. Nos. 93–95.  On November 19, 2021, Plaintiff filed a memorandum of law in opposition and a counterstatement to Chiquita's Rule 56.1 statement.  Dkt. Nos. 103–104.  Chiquita filed a reply memorandum of law in support of its motion on November 26, 2021.  Dkt. No. 107.

Chevron moved for summary judgment on November 5, 2021, Dkt. No. 96, and filed a memorandum of law in support, a Rule 56.1 statement, and a declaration in support, Dkt. Nos. 97–99.  Plaintiff filed a memorandum of law in opposition, a counterstatement to Chevron's Rule 56.1 statement, and a declaration in opposition on November 19, 2021.  Dkt. Nos. 100–102.  On November 26, 2021, Chevron filed a reply memorandum of law in support of its motion and a reply to Plaintiff's additional facts.  Dkt. Nos. 105–106.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact

exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the

non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v.

Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105,

114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R.

Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-

moving party must also demonstrate more than "some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on

conclusory statements, or on mere assertions that affidavits supporting the motion are not

credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).[4]

## DISCUSSION

Defendants Farrell Lines, Chiquita, and Chevron argue that Plaintiff's claim is barred by the three-year statute of limitations.  Dkt. No. 82 at 3–5; Dkt. No. 93 at 1, 3–6; Dkt. No. 97 at 1–5.  Chevron also separately argues that Plaintiff has not produced evidence to establish that Chevron is liable in this action.  Dkt. No. 97 at 1, 5–8.  The Court first turns to the statute-of-limitations argument before turning to Chevron's argument.

## I.      Statute of Limitations

Defendants argue that Plaintiff's claim is barred by the statute of limitations because Badamo knew or had reason to know, more than three years prior to filing suit on July 28, 2020, that he was injured due to a potential workplace exposure to asbestos.  First, Defendants argue that Badamo knew or should have known that he was injured prior to July 29, 2017 despite not having a definitive diagnosis of lung cancer.  More specifically, Defendant claim that Badamo knew or should have known that he was injured no later than July 26, 2017 after he had received a chest X-ray showing a mass on his lung (on July 17, 2017), he received a chest CT that

---

[4] The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  L.R. 56.1(a).  Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  L.R. 56.1(b).  All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

confirmed the mass (on July 21, 2017), and he was counseled by Dr. Gowda that the mass was "highly suggestive of advanced lung cancer" (on July 26, 2017).  Second, Defendants argue that Badamo knew or should have known that the injury was potentially related to a workplace exposure prior to July 29, 2017, based on the fact that Badamo had filed a lawsuit in 2008 alleging asbestos exposure and various injuries.

Plaintiff responds that the action was timely filed on July 28, 2020 because the cause of action did not accrue until at least August 2, 2017 when the biopsy results were used to diagnose Badamo with lung cancer.  Plaintiff contends that any conversations Badamo had with his doctor before the biopsy merely communicated that cancer was suspected and that, at a minimum, there is a genuine issue of material fact as to what Badamo was told and understood about the mass on his lung at the July 26, 2017 appointment.  Plaintiff also argues that, because Badamo had already filed an action in 2008 about his non-malignant asbestos-related injuries, Badamo needed confirmation that the mass in his lung was cancerous before that statute of limitations began to run on this claim.

Claims under the Jones Act are subject to the same three-year statute of limitations that apply to claims under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.* *See* 46 U.S.C. § 30104 ("Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section."); 45 U.S.C. § 56 ("No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued."); *Gonzalez v. U.S. Lines*, 1996 WL 603931, at *2 (S.D.N.Y. Oct. 22, 1996) (stating that the Jones Act incorporates the three-year statute of limitations applicable to claims arising under FELA).  "The law developed under the FELA applies to Jones Act claims

because it is incorporated by reference into the Jones Act." *Puthe v. Exxon Shipping Co.*, 802 F. Supp. 819, 820 (E.D.N.Y.), *aff'd*, 2 F.3d 480 (2d Cir. 1993).

"With respect to 'gradual injuries'—those which occur gradually, over long periods of time, due to ongoing exposure to harmful working conditions—the Supreme Court has adopted a 'discovery rule' and held that the FELA [and Jones Act] statute of limitations accrues when the injury 'manifests' itself, taking into account whether the plaintiff 'should have known' of his injury." *Mix v. Delaware & Hudson Ry. Co.*, 345 F.3d 82, 86 (2d Cir. 2003) (alteration adopted) (quoting *Urie v. Thompson*, 337 U.S. 163, 170 (1949)). In other words, a Jones Act/FELA action "accrues when 'the plaintiff in the exercise of reasonable diligence knows both the existence and the cause of his injury.'" *Id.* (quoting *Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1080 (2d Cir. 1988)); *see also Folmsbee v. Metro-N. Commuter R. Co.*, 495 F. App'x 122, 123 (2d Cir. 2012) (summary order). Put another way, a Jones Act/FELA "cause of action accrues for statute of limitations purposes when a reasonable person knows or in the exercise of reasonable diligence should have known of both the injury and its governing cause." *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 865 (7th Cir. 1996) (quoting *Fries v. Chicago & Nw. Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990)). Both prongs of this test "require 'an objective inquiry into when the plaintiff knew or should have known, in the exercise of reasonable diligence, the essential facts of injury and cause.'" *Id.* (quoting *Fries*, 909 F.2d at 1095).

The parties disagree over the date on which Badamo knew or should have known he had an injury—alleged in the Second Amended Complaint to be lung cancer.[5]  It cannot be disputed

---

[5] The Court focuses its analysis on the first prong of the statute-of-limitations test because Plaintiff does not appear to contest that Badamo knew or should have known that the injury was caused by workplace exposure to asbestos on the same date that he knew or should have known

that by July 27, 2017, Badamo knew or should have known that he had a large mass in his lung that was "highly suggestive" of cancer. But Badamo does not claim that the mass itself was the injury he suffered, and it is undisputed that Badamo was not definitively diagnosed with lung cancer until after the biopsy was conducted on August 2, 2017, and therefore he could not have known with certainty that he had lung cancer until after that date. "The fact that [a plaintiff] may not have had actual knowledge of his medical diagnosis would not relieve him of his duty of exercising due diligence based upon strong indications that he did, in fact, have an injury." *Mix*, 345 F.3d at 87. The question then becomes whether Badamo *should have* known of the existence of his injury, the lung cancer, prior to July 29, 2017—three years before the action was filed. This question, however, is not to be resolved on summary judgment and is reserved for the factfinder. *See, e.g.*, *Marburgh v. Union Pac. R.R. Co.*, 2021 WL 1893222, at *3 (D. Neb. May 11, 2021) ("Application of the discovery rule involves determining what the plaintiff knew or should have known, which is a factual question that is appropriate for the trier of fact." (citing cases)).

The statute of limitations for Jones Act cases does not begin to run until the plaintiff in the exercise of reasonable diligence knows or should have known of "the existence" of the injury upon which he is bringing suit. The "should have known" standard thus requires the plaintiff, upon receiving information suggestive of an injury, to act with reasonable diligence to determine whether the injury exists. *See Mix*, 345 F.3d at 86 (stating that claim "accrues when the plaintiff in the exercise of *reasonable diligence* knows both the existence and the cause of his injury" (emphasis added) (internal quotation marks omitted)); *Folmsbee*, 495 F. App'x at 123 (same); *Tolston*, 102 F.3d at 865 (stating that claim "accrues for statute of limitations purposes when a

---

that he was injured. *See, e.g.*, Dkt. No. 87.

reasonable person knows or in the exercise of *reasonable diligence* should have known of both the injury and its governing cause" (emphasis added)); *Marburgh*, 2021 WL 1893222, at *2 ("The determination of when a claim accrues requires an objective inquiry into when a claimant knew or should have known, in the exercise of *reasonable diligence*, the 'essential facts of injury and cause.'" (emphasis added) (quoting *White v. Union Pac. R.R. Co.*, 867 F.3d 997, 1001 (8th Cir. 2017))).  In other words, the statute of limitations does not preclude a lawsuit based upon an injury that the plaintiff did not know existed unless the plaintiff failed to act with reasonable diligence and should have known of the injury with the exercise of reasonable diligence.  On the record here, however, the Court cannot say as a matter of law that the combination of the chest X-ray results, chest CT results, and consultation with Dr. Gowda were such that Badamo "knew" he had lung cancer or should have known that he had lung cancer prior to July 29, 2017, particularly when Badamo's own treating physician determined that further tests would be necessary to determine the existence of the injury.

*Edgett v. Union Pac. R.R. Co.*, 2020 WL 13002518 (D. Neb. June 19, 2020), supports the conclusion that the suspicion of cancer is insufficient alone to start the statute of limitations for a FELA claim and therefore for a Jones Act claim.  In *Edgett*, the defendant railroad moved for partial summary judgment, arguing that the claim—filed on August 24, 2018—was time-barred by FELA's three-year statute of limitations.  *Id.* at *1.  The decedent in *Edgett* sought medical treatment in July 2015 for midback pain and constipation and underwent an ultrasound and CT scan.  *Id.* at *2.  In late July, his physician expressed concern that he may have a colon or other type of GI tumor.  *Id.*  On August 6, 2015, the decedent underwent a chest CT, which noted a history of weight loss and shortness of breath, showed a "[p]leural-based mass in the right upper lobe laterally measuring 3.1 cm" and "[a]dditional smaller nodules," and reflected that the

"[f]indings are concerning for dominant metastatic lesion in the right upper lobe with small adjacent satellite nodules." *Id.* On August 20, 2015, the decedent had a lung biopsy, and the pathology report from that biopsy (signed the next day) diagnosed the decedent with squamous cell lung cancer. *Id.* The decedent's wife testified that she believed that she and her husband were informed of the diagnosis within a week of the date of the pathology report. *Id.* Based on this record, the court in *Edgett* held that there was a genuine issue of material fact relating to the accrual of the FELA claim. *Id.* at *4. Even though the decedent had sought medical care in July 2015, his physician expressed concerns that the decedent may have some form of cancer in late July 2015, and a chest CT found a mass on the decedent's lung that was "concerning for dominant metastatic lesion," *id.* at *2, the court concluded that "[t]aking the facts in the light most favorable to the plaintiff, it has not been shown that [the decedent] was even aware of his cancer diagnosis before August 24, 2015," *id.* at *4, which was the date marking three years before the action was filed. In coming to this conclusion, the *Edgett* court relied in part on the fact that the defendant railroad had not presented evidence to controvert the testimony that the decedent and his wife "were not informed of the biopsy results until several days to a week after a pathologist determined the diagnosis of lung cancer" on August 21, 2015. *Id.* In short, on these facts, which are similar to those of Badamo's circumstances, the court held that the defendant railroad had not shown as a matter of law that a diagnosis that was "concerning" for lung cancer was not sufficient in and of itself to establish that the decedent knew or should have known that he suffered from lung cancer or that the claim had accrued. *Id.*

Defendants argue that a definitive diagnosis is not required for a claim to accrue and start the statute-of-limitations clock. It is true that a definitive diagnosis is not required for a claim to accrue. The statute of limitations begins to run when the injury manifests itself or when the

plaintiff—with reasonable diligence—should have known of its existence and knew or should have known of the cause.  The cases on which Defendants rely to say that a definitive diagnosis is not required all either involve injuries that individuals can perceive on their own without a medical diagnosis or hold that a medical diagnosis as to the *cause* of an injury (as opposed to the existence of the injury) is not required for a claim to accrue.  *See, e.g.*, *Tolston v. Nat'l R.R. Passenger Corp.*, 102 F.3d 863, 865 (7th Cir. 1996) (involving knee pain and stating that medical opinion that injury was work-related was not necessary for claim to accrue); *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 708 (7th Cir. 2015) (involving hand and shoulder pain); *Emmons v. S. Pac. Transp. Co.*, 701 F.2d 1112, 1122 (5th Cir. 1983) (involving ankle problem and stating that medical diagnosis as to the cause of injury was not required to start the statute of limitations); *Fries v. Chicago & Nw. Transp. Co.*, 909 F.2d 1092, 1095–96 (7th Cir. 1990) (involving hearing loss).  They are thus not apposite.  Contrary to injuries like joint pain and hearing loss, which can manifest to an individual before any medical diagnosis is made, there is no evidence that injuries such as lung cancer manifest in the same manner.  As discussed above, Dr. Rosenberg testified that there was no way that Badamo could have learned that he had lung cancer without having a biopsy done.  And courts have held that certain diseases may be more reliant on medical diagnoses than other diseases when it comes to claim accrual.  *See, e.g.*, *Edgett*, 2020 WL 13002518, at \*4; *Muse v. Freeman*, 197 F. Supp. 67, 69 (E.D. Va. 1961) (stating that "[i]t is clear that any statute or period of limitations begins to run when the libellant was informed of his illness by a physician" where the illness at issue was tuberculosis); *cf. Bradt v. United States*, 221 F.2d 325, 325–26 (2d Cir. 1955) ("The seaman cannot and should not be expected to make a self-diagnosis of a progressive disease like tuberculosis.  We hold that the

statute [the Suits in Admiralty Act, 46 U.S.C. § 745] did not here begin to run until the libelant was informed of his illness by a physician." (citing *Urie*, 337 U.S. at 163)).

Defendant Chevron argues that Badamo knew he had a pulmonary disease that could turn into lung cancer back when Badamo filed a lawsuit in 2008 and that he "was in possession of all the knowledge which he needed to file a lawsuit for an asbestos related injury at that time."  Dkt. No. 105 at 3; *but see* Dkt. No. 91 at 6 n.2 ("For purposes of this motion, Farrell Lines is not arguing that the statute of limitations began to run on Plaintiff's claims prior to 2008."); Dkt. No. 107 at 6 n.2 (same for Chiquita).  The Second Amended Complaint here, however, does not generally allege an asbestos-related injury; it specifically alleges lung cancer.  Dkt. No. 50 at 10 ¶ 23, 11 ¶ 31.  And courts have applied a "separate diseases rule" in the context of Jones Act/FELA claims meaning that "the statute of limitations runs separately for each asbestos-related disease."  *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 152 (2003).  "At least in the toxic chemical or asbestos cases, the disease of cancer should be treated as a separate cause of action for all purposes.  There should be no cause of action or beginning of the running of limitations until the diagnosis of the disease."  *Hagerty v. L & L Marine Servs., Inc.*, 788 F.2d 315, 320 (5th Cir. 1986); *see also Nelson v. A.W. Chesterton Co.*, 2011 WL 6016986, at *1 (E.D. Pa. Oct. 27, 2011) ("Under the separate disease rule, a plaintiff may bring suit for a nonmalignant asbestos-related disease without triggering the statute of limitations for any malignant asbestos-related diseases which may later develop.").  Thus, Chevron's argument fails.

Defendant Chevron also argues that Badamo knew he was injured on July 17, 2017 when the chest X-ray showed a mass on Badamo's lung.  Dkt. No. 97 at 4.  But again, as noted above, the injury of which Plaintiff brings suit is not simply any asbestos-related lung injury to Badamo; Plaintiff specifically brings suit alleging the injury of lung cancer.  The malignancy of the mass

is what distinguishes this injury from previous asbestos-related lung injuries that Badamo may have suffered.  Absent the malignancy to the mass on Badamo's lung, there is no separate disease for which a suit could be brought.  In fact, the X-ray report did not suggest malignancy and instead suggested that the "[f]indings may represent a large pleural plaque."  Dkt. No. 83-1 at 2.  Thus, Badamo could not have known from the X-ray alone that he had lung cancer.

For these reasons, Defendants are denied summary judgment on the statute-of-limitations issue for Plaintiff's Jones Act claim.

## II.    Whether Plaintiff Has Produced Evidence From Which a Jury Could Find That Chevron is Liable

Defendant Chevron argues that it is entitled to summary judgment because Plaintiff has not produced evidence sufficient to establish that Chevron is liable in this action.  Dkt. No. 97 at 5–8.  In particular, Chevron argues that Plaintiff has not provided evidence that Badamo was specifically exposed to asbestos on any of Chevron's four ships in this action—the Gulf Maracaibo, Gulfhorn, Gulfmills, and Gulfswamp.  Dkt. No. 105 at 4–10.  Chevron asserts that, "[w]hile there is evidence that Plaintiff spent a total of 87 days of his entire career spread over 4 different Chevron ships, there is no testimony of what work he specifically performed on those ships during the limited time he was on them; the conditions in which he worked on those particular ships; whether asbestos was recalled specifically on those ships, or even the condition it was in or possible exposure thereto by the plaintiff on any of those ships even if asbestos was present."  *Id.* at 7.  In response, Plaintiff argues that a plaintiff bringing a Jones Act claim has a relaxed burden of proof to establish causation and that there is substantial evidence upon which a jury could find that Badamo was exposed to asbestos aboard the vessels owned or operated by Chevron.  Dkt. No. 100 at 3–14.

"The Jones Act provides a federal remedy for seamen injured as a result of negligence." *Adams v. Liberty Mar. Corp.*, 475 F. Supp. 3d 91, 112 (E.D.N.Y. 2020) (quoting *Haney v. Miller's Launch, Inc.*, 773 F. Supp. 2d 280, 286 (E.D.N.Y. 2010)); *see also* 46 U.S.C. § 30104 ("A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer.  Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section.").  "The elements of a claim of negligence under the Jones Act are (1) that the plaintiff was a member of the crew of a vessel and that he was acting in the course of his employment, (2) that the defendant was the plaintiff's employer, (3) that the defendant or one of its officers, employees, or agents was negligent, and (4) that such negligence played any part, no matter how slight, in bringing about an injury or illness to the plaintiff." *Carmody v. ProNav Ship Mgmt., Inc.*, 224 F.R.D. 111, 122 (S.D.N.Y. 2004) (citing *Williams v. U.S.*, 712 F. Supp. 1132, 1135 (S.D.N.Y. 1989)); *see also Scoran v. Overseas Shipholding Grp., Inc.*, 703 F. Supp. 2d 437, 446 (S.D.N.Y. 2010) (same); *Adams*, 475 F. Supp. 3d at 112; *Haney*, 773 F. Supp. 2d at 286.[6]

"A plaintiff's burden of proof in a Jones Act case is not a heavy one.  Indeed, courts have held that, under the Act, a shipowner is liable for its employee's injuries if the employee proves by a preponderance of the evidence that the shipowner's negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Scoran*, 703 F. Supp. 2d at 446 (internal quotation marks omitted); *see also Nasser v. CSX Lines, LLC*, 191 F. Supp. 2d 307, 314 (E.D.N.Y. 2002) ("The Jones Act carries with it a substantially relaxed quantum of

---

[6] The parties disagree over the exact elements of a Jones Act claim.  *See* Dkt. No. 97 at 6; Dkt. No. 100 at 6 n.1.  But the Court need not resolve this disagreement at this time as it does not affect the Court's decision on Chevron's motion.

proof required to establish causation.  That is, plaintiff need only demonstrate that defendant's 'negligence played any part, even the slightest, in producing the injury or death for which damages are sought.'" (quoting *Ferguson v. Moore-McCormack Lines*, 352 U.S. 521, 523 (1957))); *Quiles v. City of New York*, 978 F. Supp. 2d 374, 384–85 (S.D.N.Y. 2013) ("In keeping with the remedial purposes of the Jones Act, the standard that a plaintiff must meet to establish negligence is relatively low."); *Soliman v. Maersk Line Ltd.*, 235 F. Supp. 3d 410, 417 (E.D.N.Y. 2017) ("Where a maritime employer acts negligently, the broad remedial nature of the Jones Act demands that causation be judged under a reduced standard.").  "Evidence of causation may be entirely circumstantial and direct proof is not required." *Soliman*, 235 F. Supp. 3d at 417 (citing *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 507 (1957)).  "Furthermore, in Jones Act cases, '[t]he right of the jury to pass upon the question of fault and causation must be most liberally viewed.'" *Scoran*, 703 F. Supp. 2d at 446 (alteration in original) (quoting *Oxley v. City of New York*, 923 F.2d 22, 25 (2d Cir. 1991)).  In other words, "[a] plaintiff is entitled to go to the jury if 'the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury . . . for which damages are sought.'" *Diebold v. Moore McCormack Bulk Transport Lines, Inc.*, 805 F.2d 55, 57–58 (2d Cir. 1986) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506 (1957)).

If the record is construed in the light most favorable to Plaintiff, the evidence before the Court on Chevron's motion for summary judgment would be sufficient to satisfy the reduced causation standard under the Jones Act and is such that a reasonable jury could find that Badamo was exposed to asbestos aboard Chevron's vessels.  Although Badamo never specifically testified regarding Chevron's vessels by name, it is undisputed he served as a fireman/water-tender and as an oiler on Chevron's vessels and he testified that he worked in the engine room in

24

those positions.  Badamo also testified about how persons who worked in the engine room generally were exposed to asbestos, how the ventilation constantly circulated what he understood to be asbestos dust in the engine rooms, and how the working conditions in the engine room resembled a "mild snowstorm" of asbestos insulation.  He also testified that he was exposed to asbestos in each position he held and that "[he] was exposed to asbestos every time [he] went on a ship."  Pl.'s CS Chevron ¶¶ 14, 89; Chevron 56.1 Reply ¶ 59; *see also* Dkt. No. 102-7 at 29:2–3.  In other words, though Badamo did not testify about the Chevron vessels by name, there is evidence regarding the positions he held on those vessels and testimony regarding the working conditions that Badamo faced when working in those positions generally.  In addition, Plaintiff put forth a sworn statement wherein Badamo declared, under penalty of perjury, that, aboard a number of vessels (including Chevron's four vessels by name), asbestos-containing products were used; dust was released from these products and breathed in by all workers on these vessels on a daily basis; he breathed in dust from asbestos-containing products in crew quarters, engine rooms, passage ways, and galley on a daily basis; and he breathed dust from asbestos-containing products including pipe insulation, gaskets/packing, block insulation, insulating cement, turbines, valves, boilers, and pumps.[7]  *See* Dkt. No. 102-6.  There also is evidence that, when Badamo worked in engine rooms, the steam lines that connected the engine room machinery

---

[7] In *Casey v. A-C Product Liability Trust*, the district court denied summary judgment in favor of the defendant shipowner, relying on a similar sworn statement.  No. 11-cv-30219, ECF No. 76 at 4–5, 8 (E.D. Pa. Aug. 4, 2014).  Like Chevron does here, the defendant shipowner in *Casey* argued that there was insufficient evidence to establish that the plaintiff was exposed to asbestos on any vessel it owned.  *Id.* at 1–2.  The court in *Casey* rejected this argument, reasoning that the plaintiff's sworn statement provided direct evidence that a jury could credit to conclude that the plaintiff was exposed to asbestos on the defendant's vessels.  *Id.* at 8.  Further, unlike in this case, the plaintiff in *Casey* was never deposed, and the court denied summary judgment on the basis of the sworn statement alone.  *Id.* at 2, 8.  Here, in addition to the sworn statement, there is testimony from Badamo himself alongside other records and expert testimony.

were insulated with asbestos; that ships built between 1940 and 1975 used substantial amounts of asbestos for insulation and fire protection and that all vessels have some asbestos insulation on board (from the NAVICs); and that the four Chevron vessels at issue in this case were constructed during the time period identified in the NAVIC.  Plaintiff's expert Corbin also provided evidence that the equipment in engine rooms where Badamo would have worked would have been insulated with asbestos, and Plaintiff's expert Cooke provided evidence that asbestos was widely installed aboard merchant vessels between 1940 and the 1970s, that asbestos fibers could become airborne, and that Badamo's responsibilities on the vessels would involve extended exposure to the fibers.  It may be that certain of this evidence, in isolation, would not be enough to support a jury verdict.  Taken together, however, the evidence is sufficient to support at least a circumstantial case that Badamo was exposed to asbestos on the Chevron vessels and to defeat Chevron's motion for summary judgment.  There is a relaxed causation standard under the Jones Act, the statute permits a jury verdict to be based entirely on circumstantial evidence, and, in Jones Act cases, "[t]he right of the jury to pass upon the question of fault and causation must be most liberally viewed."  *Scoran*, 703 F. Supp. 2d at 446 (alteration in original) (quoting *Oxley*, 923 F.2d at 25).

Chevron's arguments to the contrary are unavailing.  Chevron highlights the relatively few number of days[8] that Badamo served on Chevron vessels over the course of his career in the merchant marines.  However, although Badamo served longer on other vessels, a Jones Act claim lies where there is evidence that "employer negligence played any part, *even the slightest*, in producing the injury."  *Diebold*, 805 F.2d at 57 (quoting *Rogers*, 352 U.S. at 506).  Chevron

---

[8] As stated above, the parties dispute whether Badamo served eighty-seven or eighty-nine days on the Chevron vessels.

also points to evidence that Badamo did not have training to identify asbestos.  That admission is relevant to the weight which the jury may put upon Badamo's testimony.  If he did not have the training to identify asbestos, the jury might discredit his testimony that he knew he was exposed to asbestos.  But that argument goes to the weight and not the sufficiency of the evidence.  A sailor need not have training in asbestos to offer circumstantial evidence he was exposed to asbestos.  There is sufficient evidence from which the jury could find that the dust that was "constantly circulated" in the engine room to the point it constituted a "mild snowstorm" of asbestos dust, particularly combined with the expert testimony that asbestos would have been on Chevron's vessels in the locations where Badamo was assigned to work.  Chevron also argues that Plaintiff's counsel led the questioning and did not elicit any specific testimony about the Chevron vessels, but that fact is not relevant to the question whether the evidence is sufficient to survive summary judgment.  Chevron was present for the deposition and could have attempted to elicit that Badamo could not testify that he was exposed to asbestos on the Chevron vessels.  Counsel eschewed that opportunity.  Finally, Chevron argues that Plaintiff overstates the inferences that can be drawn from the NAVICs and Plaintiff's various experts regarding the extent of asbestos on the Chevron vessels, but it does not dispute that such evidence is admissible or that it supports that there was asbestos in the relevant locations on the vessels.  In short, while any of these arguments might be sufficient to rebut a portion of Plaintiff's evidence if Plaintiff were relying on that portion alone, Plaintiff relies on the evidence viewed as a whole and that evidence, when construed in favor of Plaintiff, provides enough for Plaintiff to get to the jury.

For these reasons, Chevron has not shown that it is entitled to summary judgment.

## CONCLUSION

The motions for summary judgment are DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 80, 92, 96.


SO ORDERED.

Dated: May 9, 2022
      New York, New York

                                              LEWIS J. LIMAN
                                   United States District Judge